64

898 P.2d 576

HOUSING FINANCE AND DEVELOP-MENT CORPORATION, a public body and body corporate and politic, Plaintiff–Appellee,

v.

James C. CASTLE (aka James Christian Castle); James C. McIntosh (aka James Castle McIntosh); Hawaiian Trust Company, Limited, a Hawaii Corporation, Trustees under that certain unrecorded trust agreement dated August 5, 1974 made by Alice Hedemann Castle as "settlor" and James Christian Castle as "individual trustee" as amended by those certain unrecorded agreements dated May 15, 1976 and January 25, 1978, Defendants–Appellants, and Bryan Matsuo Agena, Elsa Kazue Agena; Colleen Ahu; Robert Kahinano Ahu, III; Charlotte Louise Phillips–Avila; Richard Frank Avila; Barbara Jean Baldauf; James Aloysius Baldauf, Sr.; Juliette Kuualoha Bissen; Morris Warren Bissen; Beverly Ann Brunke; Victor August Carl Brunke; Jack Louis Cambra; Sarah Leilani Cambra; Colette M. Chow; Philip Sui Tenn Dang; Marshall Allan Eubanks; Susan Moana Eubanks; Douglas Thomas Freitas; Loretta Gertrude Freitas; Rikue Hamasaki; Robert Mamoru Hamasaki; Dennis Wayne Hethcote; Palmyra Kuualoha Hethcote; Gladys Yoshiko Ishii; Luitza Wai King Louie; Roland Siu Yin Louie; David Sprenkle Martin; Dorothy Schumacher Martin; Kenneth Kiyoto Otsuka; Roxane Wood Otsuka; Fred Masakuni Sakamoto; Grace Yukie Sakamoto; Juanita Sampang; Lawrence E. Sampang; Hisako Shishido; Ichiro Shishido; Chieko Sakurai Soares; Manuel Soares; Betty Masagayani Stephenson; Castle K.K. Waiolama; Mary K. Waiolama; Doris Yoshie Watanabe; Kenneth Hitoshi Watanabe; Raymond Masato Watanabe; Sue–Ellen Kam Hung Watanabe; Janet Miyeko Curry (aka Janet M. Curry); Antonio Rafols Josol; Gabina Rosa Josol; Claire Kaeo; Elijah Kaeo; Janice Lee; Simon C.W. Lee; Jack W. Morrison, Jr.; Victoria L. Morrison; El-len Raynette Pabillano; Bryan Geoffrey Pearson; Celestine Aimee Pearson; Loretta T. Schuler; Frances D. Silva; Louis F. Silva; Oinah E. Silva; John Does 1–50; Mary Does 1–50; Doe Partnerships 1–50; Doe Corporations 1–50; and Doe "Non–Profit" Corporations 1–50; Doe Entities 1–50, Defendants.

HOUSING FINANCE AND DEVELOP-MENT CORPORATION, a public body and body corporate and politic, Plaintiff–Appellee,

v.

HAROLD K.L. CASTLE FOUNDATION, a Hawaii non-profit corporation, Defendant–Appellant, and Jane Ann Wade Benouis; Mustapha Kemal Benouis; Cheryl Brooke Bukarau; Waqanivalu Isoa Bukarau; Caren Shizuko Demeo; Howard Joseph Demeo; Marion G. Eaker; Roland W. Eaker; Barbara L. Jennings; Kirk E. Jennings; Bernadette Kahahawai; Joseph Kahahawai; Patricia Ann Kop; William Kop; Janice Marie Louch; William James Louch; Sharyn Lee Munchmeyer; Myra Naomi Munekata; Deborah Chieko Nogami Oyama; Neil Mitsuo Oyama; Cleighton Pang; Sharon S. Pang; Catherine Hills Rice; Richard Knapp Rice (James Paul Lynn Flynn, Jr. and Barbara Jo Flynn Sanchez, Sellers under Agreement of Sale); Heather Shepard Shannon; Mackenzie Herrick Shannon; Leonard John Silva; James Jerome Smith; Rita Jane Renfro Smith; Chad Ken Taniguchi; Dolly Sasaki Towne; Gordon Sheldrake Towne; Earl Leroy Walker; Gary Lynn Wiseman; Jane Saeko Ikeda; Koyoshi Ikeda; John A. Roney; Nancy C. Roney, Defendants–Appellees, and Richard Francis Buonviri; Susan Harrison Buonviri; Barbara Z. Culler; Timothy A. Culler (William E. Lee and Ruth B. Lee, Sellers under Agreement of Sale); Lawrence Bernard Kane, Jr.; Puanani Janette Kane; Deborah Marr; Dorothy Mitsuko Oda; John Eichi Oda; Lydia Robinson; Thurston E. Robinson; Carol Lynn Shulik; David Ronald Shulik; Dorothy Eugenia Sigler; Edward Richard Under-

wood; Edmund H. Volkart; May Ellen D. Volkart; John Ronald Orsini; Karen Jo Patrick Orsini; John Does 1–50; Mary Does 1–50; Doe Partnerships 1–50; Doe Corporations 1–50; Doe "Non–Profit" Corporations 1–50; and Doe Entities 1–50, Defendants.

HOUSING FINANCE AND DEVELOPMENT CORPORATION, a public body and body corporate and politic, Plaintiff–Appellee,

v.

HAROLD K.L. CASTLE FOUNDATION, a Hawaii non-profit corporation, Defendant–Appellant, and Charles Matthews White, George S. Yamamoto, Eloise F. Wickersham, and Hawaiian Trust Company, Limited, a Hawaii corporation, Successor Trustees of the trust created by the unrecorded Declaration of Revocable Living Trust dated September 11, 1979, made by Horace Winfred Beek White, as Settlor and Trustee, as amended; Bishop Trust Company, Limited, a Hawaii corporation, Ancillary Special Administrator of the Estate of Lewis Winn Stunston, Jr., having been so appointed by the Circuit Court of the First Circuit, State of Hawaii, in a proceeding designated as Probate No. 41923; Leo G. Ziffren, Lester Ziffren and Robert L. Caldwell, successor Trustees of the trust created by Declaration of Trust dated September 9, 1988, as amended, executed by Paul Trousdale, also known as Paul Whitney Trousdale and Paul W. Trousdale, as Trustor and Trustee, a memorandum of which has been recorded in the Office of the Assistant Registrar of the State of Hawaii as Document No. 1752870 and in the Bureau of Conveyances of the State of Hawaii as Document No. 90–144115; W. Lawrence Clapp, Ancillary Special Administrator of the Estate of Marguerite T. Peck, also known as Marguerite Reid Peck, Marguerite Trousdale, Marguerite Reid Trousdale, Marguerite Trousdale Peck and Marguerite Peck, having been so appointed by the Circuit Court of the First Circuit, State of Hawaii, in a proceeding designated as Probate No. 42920;

W. Lawrence Clapp, Successor Trustee of the trust created by the Trust Agreement dated June 30, 1965, made by and between Paul Whitney Trousdale as Settlor, and Horace Winfred Beek White, as Trustee, which has been filed in said office as Document No. 378726 and recorded in said Bureau in Liber 5135, at page 538, as supplemented; W. Lawrence Clapp, Ancillary Personal Representative of John Dabney Murchison, deceased, having been so appointed by the Circuit Court of the First Circuit, State of Hawaii, in a proceeding designated as Probate No. 40353; Willis Lawrence Clapp, as Authorized Agent and Attorney-in-fact on behalf of the Estate of Clinton Williams Murchison, Jr., deceased, pursuant to and under the supervision of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in Case No. 385–30266–A–11; Heirs and/or Devisees of Thomas H. Lively, Jr. and Robert F. Thompson, deceased, by virtue of an unrecorded written agreement as disclosed by that certain Affidavit dated August 31, 1988; Embassy Hawaii Corporation, a Hawaii corporation (formerly known as Blackfield Hawaii Corporation, a Hawaii corporation); Robert Steven Ale; Frances K. Asing; John M. Asing; Jamie Louise Ault; John William Ault; Holly K. Bachini; Robert C. Bachini; Gail Choon Sil Brown; William Wesley Harrison Brown; Carole Ann Brutlag; Bonnie Sue Busch; Gail Diane Caveney; Robert Lawrence Caveney; Dennis Deano Crabtree; Lisa Ann Crabtree; Miriam S. Curry; Raphael J. Curry; Joseph Lovejoy Dwight III; Robin Wittbrodt Dwight; Helga Gertrude Emmerson; John George Emmerson; Byron J. Ferreira; Carolyn G. Ferreira; Geraldine Reiko Fukumoto; Dolores Jane Graham; Paul Frederick Graham; James Douglas Hamblett; Gwenette Ann Higa; Harumi Hirata; Malfalda Hirata; Betty J. Howard; George F. Howard; Donald A. Hudson; Kathleen Defoster Hudson; Elizabeth Theresa Kollan; Gregory Michael Kollen; Lydia

K. Lake; Thomas C. Lake, Jr.; Julie Rae Lindemann; Richard John Lindemann; Danel Allen McDougal; Jo Shalimar McGirr; Murton Ken McGirr; Craig Stephen McGlinn; Kathleen Tracy McGlinn; Donald Owen McInnis; Peggy Lorraine McInnis; Ann Stamp Miller; Peter Franklin Miller (Debra T. Ozawa, Seller under Agreement of Sale); Donald Ray Moore; Cary R. Nederhouser; Denise Nederhouser; Cynthia Rae Newsome; Keith Allison Newsome; Nooria Noor; Elizabeth Kelsey Owens; Elmer Lee Owens; Carol A. Pagaduan; Orlando R. Pagaduan; Lucille M. Peck; Marcella Elvera Porzelt; Russell Daniel Porzelt; Hillary Ann Radovich; Scott Douglas Radovich; Alfredo Roque; Arnel M. Roque; Rosario Roque; Gary Paul Shuman; Geraldine Patricia Shuman; Sylvester Sneidar; Tiare Jacque Sneidar; Carolyn J. Steinberg; John Wesley Stephens; Christopher John Stevens; Holly Carlyn Stevens; Judy Koshie Tanabe; Harry Eugene Wellman; Mary Mari Yasuda; Roy Masao Yasuda, Frederick M. Smith; Catherine K. Smith, Defendants–Appellees, and Deborah Kay Ziemke; John Does 1–200; Mary Does 1–200; Doe Partnerships 1–50; Doe "Non–Profit" Corporations 1–50; Doe Corporations 1–50; and Doe Entities 1–50, Defendants.

HOUSING FINANCE AND DEVELOPMENT CORPORATION, a public body and body corporate and politic, Plaintiff–Appellee,

v.

James Christian CASTLE (aka James C. Castle); James Castle McIntosh (aka James C. McIntosh); Hawaiian Trust Company, Limited, a Hawaii corporation, Trustees under that certain unrecorded trust agreement dated August 5, 1974, made by Alice Hedemann Castle, as Settlor, and James C. Castle, as Individual Trustee, as amended by those certain unrecorded agreements dated May 15, 1976 and January 25, 1978, Defendants–Appellants, and Barbara Ann Almquist; Eldon Joseph Almquist; Camille Analani Chun; Henry Anthony

Chun; Loralyn Cramer; Elizabeth Kaleikoa; Faye Kim; Michael T.I. Kim (Tracy A. Wong, fka Tracy A. Kim, Marcel Ohta and Frances Ohta, Sellers Under Agreement of Sale); Jason Tetsuo Kutaka; Susan Sumie Kutaka; Rosemarie Mielke; Werner Mielke; David Mannie Nakoa; Mieko Nishida; Yasuo Nishida; Bernadette Page; Michael R. Page; Ernest Tsuneo Watanabe; Shizue Katashima Watanabe; Herbert R. Welder, Jr.; and Nancy N. Welder, Defendants–Appellees, and Laban Lee Bun Chang; Sandra Galeone Chang; Florence Carolyn Conway; John Lee Fink; Sharon Ann Fink; Aloha Daisy Gellert; Nathan Henry Gellert III; Francis Frederick Green, Jr.; Martha Rose Green; Delmarie Motta Klobe; Thomas Michael Klobe; Barbara Louise McKee; Catherine Powell Miles; Gregory A. Miles; Enid Reid Odo; Franklin Shoichiro Odo; Mary W. Pochereva; Thomas W. Pochereva; Christine Trick Roseman; Charles Anthony Strack; Louise Kekula Strack; Nancy Cora Tano; Stephen Alan Tano; Harold Takeshi Tokunaga; Merle Miyoko Tokunaga; John Does 1–50; Mary Does 1–50; Doe Partnerships 1–50; Doe Corporations 1–50; Doe "Non–Profit" Corporations 1–50; and Doe Entities 1–50, Defendants.

HOUSING FINANCE AND DEVELOPMENT CORPORATION, a public body and body corporate and politic, Plaintiff–Appellee,

v.

HAROLD K.L. CASTLE FOUNDATION, a Hawaii non-profit corporation; James Christian Castle, James Castle McIntosh, and Hawaiian Trust Company, Limited, as Trustees under Unrecorded Trust Agreement Dated August 5, 1974, as amended, Defendants–Appellants, and Leo G. Ziffren, Lester Ziffren and Robert L. Caldwell, Successor Trustees of the trust created by the Unrecorded Declaration of Trust dated September 9, 1988, executed by Paul Trousdale, also known as Paul Whitney Trousdale and Paul W. Trousdale, as Trustor and

Trustee, a memorandum of which has been filed as Land Court Order No. 98885 and recorded at the Bureau of Conveyances as Document No. 90–144115, as amended; Bishop Trust Company, Limited, Ancillary Personal Representative of the Estate of Lewis Winn Stunston, Jr., deceased; Charles Matthews White, George S. Yamamoto, Eloise F. Wickersham and Hawaiian Trust Company, Limited, a Hawaii corporation, Successor Trustees of the Horace Winfred Beek White Revocable Living Trust dated September 11, 1970, of which a Short Form has been filed as Land Court Document No. 536101 and recorded in Book 7525, Page 173, as amended and restated; W. Lawrence Clapp, Successor Trustee under Trust Agreement dated June 30, 1965, recorded in the Bureau of Conveyances in Book 5135, Page 538 as supplemented and amended; Sonja Mui, widow; Edward Y.C. Chun, Special Administrator of the Estate of David Lawrence Mui, deceased; W. Lawrence Clapp, Ancillary Personal Representative of the Estate of Marguerite T. Peck, also known as Marguerite Trousdale, Marguerite Reid Trousdale, Marguerite Trousdale Peck and Marguerite Peck, deceased; Delphine Astoria Aki; Edward Harl Aki; Venansio Gregorio Alphons; James Rodney Anderson; Sue Carol Anderson; Iris Yuriko Arisue; Wesley Yoshio Arisue; Arcenia Aweau; Lemuel N.K. Aweau; Leslie Lois Barrows; Scott Harrington Barrows; Patricia Ellen Billington; Benjalene Queenie Cavaco; Darrell William Cavaco, Jr.; Agnes Marie Char, formerly known as Agnes Marie Oliveira; Dolores Castro Dyberg; Richard Herbert Dyberg; Mark A. Giuliani; Dianne Elizabeth Goff; Madison Lee Goff; George Takeshi Goto; Yoshie Goto; Bettye Jo Harris; Ernest James Harris; Eonis K. Hawpe; W. Carleton Hawpe; Stanley Yoshihiko Hesse; Gene Suemitsu Iseri; Victoria Lee Goodhard Iseri; John Robert Jones; Joyce Yooko Jones; Agnes Elizabeth Kamakana, also known as Elizabeth A. Kamakana; Calvin Kawailani Marquez; Cheryl Eileen Abad Marquez; John Franklin Meyers; Nona Kazumi Meyers; Glenn Y. Miyagawa, also known as Glenn Miyagawa; Herbert Y. Nishijo; Reiko I. Nishijo; Albert J.K. Perkins III; Hattie R. Perkins; Margaret Celeste Reames; Gary Stephen Santos; Kathleen Margaret Santos; Robert M. Sato; Kathleen C. Sato; Amelia Ogawa Sousa; Frank Cabral Sousa; Donald Lester Yu; Marilyn Teruko Yu, Defendants–Appellees, and Dora L. Correia; Frank N. Correia; Beverly Hodge, now known as Bevin Charles Hodge; Mary Jean Hodge; Diane C. MacDonald; John A. MacDonald; Barbara L. Nelson; Donald J. Nelson; Jeffrey Allan Roesener; Marlene Camarao Roesener; Sally Masuko Shiroma; Toshiichi Shiroma; Thomas T. Ursal; Margaret Matsui Yoshioka; Richard Toshio Yoshioka; John Does 1–200; Mary Does 1–200; Doe Partnerships 1–50; Doe Corporations 1–50; Doe "Non-Profit" Corporations 1–50; Doe Entities 1–50, Defendants.

HOUSING FINANCE AND DEVELOPMENT CORPORATION, a public body and body corporate and politic, Plaintiff–Appellee,

v.

James Christian CASTLE, also known as James C. Castle, James Castle McIntosh, Hawaiian Trust Company, Limited, a Hawaii Corporation, as Trustees of the Trust created by Article Eighth of the Last Will and Testament amended by the codicils thereto of Harold K.L. Castle, deceased, with powers to sell, lease, convey, mortgage and other powers more fully set forth therein, Defendants–Appellants, and Charles Matthews White, George S. Yamamoto, Eloise F. Wickersham and Hawaiian Trust Company Limited, a Hawaii corporation, Successor Trustees of the trust created by the unrecorded Declaration of Revocable Living Trust dated September 11, 1970, made by Horace Winfred Beek White, as Settlor and Trustee; Eloise F. Wickersham, George S. Yamamoto and Hawaiian Trust Company, Limited, Per-

68

sonal Representatives of Horace Winfred Beek White, deceased, having been so appointed by the Circuit Court of the First Circuit, State of Hawaii, through Probate No. 86–0353; Bishop Trust Company, Limited, a Hawaii Corporation, Ancillary Personal Representative of Lewis Winn Stunston, Jr., deceased, having been so appointed by the Circuit Court of the First Circuit, State of Hawaii, through Probate No. 41923; Leo G. Ziffren, Lester Ziffren and Robert L. Caldwell, successor Trustees of the trust created by the unrecorded Declaration of Trust dated September 9, 1988, as amended, executed by Paul Trousdale, also known as Paul Whitney Trousdale and Paul W. Trousdale, as Trustor and Trustee; W. Lawrence Clapp, Ancillary Personal Representative of Marguerite T. Peck, also known as Marguerite Reid Peck, Marguerite Trousdale, Marguerite Reid Trousdale, Marguerite Trousdale Peck and Marguerite Peck, having been so appointed by the Circuit Court of the First Circuit, State of Hawaii, through Probate No. 42920; W. Lawrence Clapp, Successor Trustee of the trust created by the Trust Agreement dated June 30, 1965, made by and between Paul Whitney Trousdale, as Settlor and Horace Winfred Beek White, as Trustee, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii as Document No. 370145 and recorded in the Bureau of Conveyances of the State of Hawaii in Liber 5135, Page 522, as supplemented; W. Lawrence Clapp, successor Trustee of the trust created by the Trust Agreement dated June 30, 1965, made by and between Paul Whitney Trousdale, as Settlor, and Horace Winfred Beek White, as Trustee, which has been filed in the said Office as Document No. 378726 and recorded in said Bureau in Liber 5135, Page 538, as supplemented; W. Lawrence Clapp, Ancillary Personal Representative of John Dabney Murchison, deceased, having been so appointed by the Circuit Court of the First Circuit, State of Hawaii, through Probate No. 40353; Willis Lawrence Clapp, authorized agent and attorney-in-fact for the Estate of Clinton Williams Murchison, Jr., under the supervision of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in Case No. 385–30266–A–11; Sonja Mui, widow; T. Jack Foster & Sons, a California Partnership; Paula Diane Akamine; Stanley Seitoku Akamine; Jac Ellsworth Baker; Jean Thurman Baker; Ella Jean Bator; Robert Dennis Bator; Hiromi Bauermann; Richard Werner Bauermann; Robert O. Blackshaw; Susan H. Blackshaw; Gregory Alan Blakemore; James Joseph Bowman; Patricia Ann Bowman; Robert Louis Brown, Jr.; Sandra Elizabeth Brown; Richard Guess Bryant; Richard Paul Bryant; Donna Elaine Burnett; Kathleen Margaret Carlos; Robert L. Carlos; Karen Camille Carten–Orosel; Barbara Ellen Carvalho; Walter John Carvalho; Elizabeth Pa Chai; Norman Hin Chai; Linda Chung; Mark Chung; Marylu Davids–Marks; Thad Davids–Marks; Brooke Randall Davis; Harry Bascom Davis, IV (Charles Louis Coleman and Sue Ann Coleman, Sellers under Agreement of Sale); Donald Summers Fernandez; Jeanne Louise Fernandez; David C. Hanlon; Jill Patricia Harnden; Charles Elmer Harnden, III; David Hines; Kerry Lyn Hines; Janet Lee Holmden; Robert Edwin Holmden; John Frederick Honold, Jr.; Victoria Sachiko Honold; Frances A. Kalua; Paul K. Kalua, Jr.; Peggy Ann Katz; Shelby Nathan Katz; Jih Kawahara; Michael D. Kawahara; Annetta Johns Kinnicutt; Philip Heywood Kinnicutt; Alan Lynn Kirby; Diane Lee Koushki; Mohammad Houssein Koushki; Dixie Lee Krog; Donald Krog; Nancy Elizabeth Liedke; Walter John Liedke; Argentina Logiakis; Mary Louise Luebbe; Robert Lee Leubbe; Emily Rosalind Luther; Norman Yeomans Luther; Ann Rochelle Marten; Gerald Gilbert Marten; Donald Ernest Miles; Evalee Jane Miles; Diane Saundra Minsky; Harvey Minsky; Kathleen Elizabeth Nielsen; Steffen Rosmark Nielsen; Marie A. O'Leary; Mark F. O'Leary; Michael John Orosel; Dana Marlo Peiterson; Gail Ann Peiterson;

David Francis Rodwell; Carleton Smith; Darrel A. Smith; Jeanne Cullers Smith; Sharon L. Smith; Oliver Thurman III; Janet Rosslyn Vick; Samuel Snider Vick; George Harold Wells; Janet Bickmore Wells; Anna Marie Wenz; Glen John Wenz; Jack Atwood Winson; Ruth Louise Winson; Ruth M. Witherspoon; Carroll Reglyn Wofford; Laurie Ann Wofford; Adele Kun Wha Yoo; Mikel Diane Young; Ronny A.H. Young; Kenneth Arthur Abrams; Patricia Leilani Abrams; Rodney D. Aschenbrenner; Shirley A. Aschenbrenner; Lee Ellen Johnson Bell; Richard Dale Bell, Jr.; Elaine Kekoa Butler; Matthew August Cabot; Nancy Wooster Cabot; Gary E. Camp; Wailani Luella Camp; John R. Clark; Amy Best Crews; Michael Ernest Crews; Dennis M. Dunn; Lisa A. Dunn; William Richard Harnden, Jr.; (Samuel Snider Vick and Janet R. Vick, Sellers under Agreement of Sale); Judy Ann Hatch; David S.E. Hew; Dora L. Hew; Terri–Lynn L. Johnson; Clairdene K. Kam; Sybil Leilani Kam; Arthur Joseph Labrie, Jr.; John R. Lawton; Lucille Audrey Schermerhorn; Stephen J. Spencer; Gwen Yoshie Suda; Randall Ken Suda; Josephine V. Tolhurst; Edwin H. Vick; Mary Ellen Vick; (Samuel Snider Vick and Janet R. Vick, Sellers under Agreement of Sale); Marjory Kennedy Wilson; Elsie K. Wood; Wallace E. Wood, Defendants–Appellees, and June Sachiko Tom; Melvin Gee Lim Tom; Freddie James Westbrooks; Maria Jena Westbrooks; John Does 1–50; Mary Does 1–50; Doe Partnerships 1–50; Doe Corporations 1–50; Doe "Non–Profit" Corporations 1–50; and Doe Entities 1–50, Defendants.

HOUSING FINANCE AND DEVELOPMENT CORPORATION, a public body and body corporate and politic, Plaintiff–Appellee,

v.

James Christian CASTLE, also known as James C. Castle, James Castle McIntosh, Hawaiian Trust Company, Limited, a Hawaii corporation, as Trustees of the trust created by Article Eighth of the Last Will and Testament (as amended by the codicils thereto) of Harold K.L. Castle, deceased, with powers to sell, lease, convey, mortgage and other powers more fully set forth therein, In Trust; and as Trustees under that certain unrecorded Trust Agreement dated August 5, 1974, made by Alice Hedemann Castle, as "Settlor", and James C. Castle, as "Individual Trustee", which Trust Agreement was amended by unrecorded Agreements dated May 14, 1976 and January 25, 1978, respectively, both made by the "Settlor" and the "Individual Trustee", with powers to sell, lease, convey, mortgage and other powers more fully set forth therein, Defendants–Appellants, and Charles Matthews White, George S. Yamamoto, Eloise F. Wickersham and Hawaiian Trust Company, Limited, a Hawaii corporation, Successor Trustees of the trust created by the unrecorded Declaration of Revocable Living Trust dated September 11, 1970, made by Horace Winfred Beek White, as Settlor and Trustee; Bishop Trust Company, Limited, a Hawaii corporation, Ancillary Personal Representative of Lewis Winn Stunston, Jr., deceased, having been so appointed by the Circuit Court of the First Circuit, State of Hawaii, through Probate No. 41923; Leo G. Ziffren, Lester Ziffren, and Robert L. Caldwell, successor Trustees of the trust created by Declaration of Trust dated September 9, 1988, as amended, executed by Paul Trousdale, also known as Paul Whitney Trousdale and Paul W. Trousdale, as Trustor and Trustee; W. Lawrence Clapp, Ancillary Personal Representative of Marguerite T. Peck, also known as Marguerite Reid Peck, Marguerite Trousdale, Marguerite Reid Trousdale, Marguerite Trousdale Peck and Marguerite Peck, having been so appointed by the Circuit Court of the First Circuit, State of Hawaii, through Probate No. 42920; Lawrence Clapp, Successor Trustee of the trust created by the Trust Agreement dated June 30, 1965, made by and between Paul Whitney Trousdale, as Settlor, as Horace

Winfred Beek White, as Trustee, which has been filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii as Document No. 370145 and recorded in the Bureau of Conveyances of Hawaii in Liber 5135, Page 522, as supplemented; W. Lawrence Clapp, Successor Trustee of the trust dated June 30, 1965, made by and between Paul Whitney Trousdale, as Settlor, and Horace Winfred Beek White, as Trustee, which has been filed in the said Office as Document No. 378726 and recorded in said Bureau in Liber 5135, Page 538, as supplemented; Sonja Mui, widow; Edward Y.C. Chun, Special Administrator of the Estate of David Lawrence Mui, having been so appointed by the Circuit Court of the First Circuit, State of Hawaii, through Probate No. 88–0644; Charles Matthews White, husband of Billie Jean White; Marguerite Trousdale Nelson, wife of Blyth Covey Nelson; Mary Ann Trousdale Dickie, wife of E. Gordon Dickie; Michael Leonard Benedetti; Puanani Jaclyn Benedetti; Phyllis Mildred Call; Michele Roncevic Canney; Richard Philip Canney; Lynn Janice Carey; Karen Christine Carl; Sammy Lee Carl; David Cleveland; Susan Cleveland; Cornelis Willem Collee; Ray Willard Conrad; William C. Fay; Robert Morris Grossman; Evelyn Kawaikine Chamberlain Sui Hascall; Hudson Leo Crimin Hascall; Florence Miller Hayslip; Robert Charles Hayslip; Patt L. High; Dayton L. Holt; Linda Holt; Michael Thomas Jones; Pamela Schuler Jones; Aloma T. Kadooka; Richard J. Kadooka; Ardythe Gale Kincaid; James Kahelelani Kincaid; Julia Ann Koeneke; Richard William Koeneke; Jocelyn S. Linnekin; Helen A. Martin; Joseph L. Martin; Bonnie Bond Nam; Norman Buddy Nam; Paula Adele Ress; Robert Frederick Ress; Julia Osmer Squire; Steven Nelson Squire; John Douglas Stahl; Sharon Kathryn Stahl; Juanita B. Thomas; Michael H. Thomas; Margaret Ann Vergien; Scott Charles Vergien; Ann Campbell Walenta; Richard S. Walenta; Evelyn Beryl Williams; Susan Katherine Choi; Patricia Ann De-ryke; Robert Deryke; Shirley Ann Dronsfield; Joseph Bannister Espiritu; Sandra Lea Espiritu; Robert Edwin Graves; Sandra Lee Gilbert Graves; Norma Shigeko Henderson; Kimon Scott Iannetta; Lorraine Mitsuko Ishiki; Tokusuke Ishiki; Archie S. Kaaua; Joan C. Kaaua; Michael Frederick Krijnen; Verlieann Kapule Malina–Wright; June Menzies; Linda Menzies; James Raymond Olson; Marian Jean Olson; Melvyn R. Perry; Sicily W. Perry; Ivalee Sinclair; Karen Patricia Staffelbach; Terry Farr Wood; John Cotton Wright; Arthur Christopher York, Defendants–Appellees, and John Does 1–50; Mary Does 1–50; Doe Partnerships 1–50; Doe Corporations 1–50; Doe "Non–Profit" Corporations 1–50 and Doe Entities 1–50, Defendants.

Nos. 16293, 16241 and 16625.

Supreme Court of Hawai'i.

May 19, 1995.

Bruce L. Lamon (Carol A. Eblen with him on the brief; Goodsill Anderson Quinn & Stifel), Honolulu, for defendants-appellants James Christian Castle, James Castle McIntosh, Hawaiian Trust Co., Ltd. and Harold K.L. Castle Foundation (consolidated cases in Nos. 16293 and 16625).

John Y. Yamano (William C. McCorriston, Jerrold Y. Chun and Andrew W. Char with him on the brief; McCorriston Miho & Miller), Honolulu, for appellants-defendants-trustees James Christian Castle, James Castle McIntosh and Hawaiian Trust Co., Ltd. (No. 16241).

Girard D. Lau, Deputy Atty. Gen. (Steven S. Michaels and Carolee M. Aoki, with him on the brief), Honolulu, for plaintiff-appellee Housing Finance and Development Corp.

Anthony P. Locricchio, Kailua, Thomas Lavigne, Fayetteville, NC (H. Arthur Rosenthal, with him on the brief, Kaneohe), for appellees-defendants-lessees.

Before MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and CHANG, Circuit Court Judge in place of KLEIN, J., recused.

LEVINSON, Justice.

These consolidated appeals oblige us to revisit *Hawai'i Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), *Hawai'i Housing Authority v. Lyman,* 68 Haw. 55, 704 P.2d 888 (1985), and *Takabuki v. Housing Finance and Development Corp.,* 72 Haw. 466, 822 P.2d 955 (1991), in order to address the question whether the Hawai'i Land Reform Act, Hawai'i Revised Statutes (HRS) ch. 516 (1985 & Supp.1992 & 1993 Comp.) (the HLRA)[1], has remained constitutional, *i.e.,* whether the HLRA continues to comport with the "public use" clauses of the fifth amendment to the United States Constitution[2] and article I, section 20 of the Hawai'i Constitution (1978).[3] The question arises as a result of the appeals of the defendants-appellants James C. Castle, James C. McIntosh, and Hawaiian Trust

Company, Ltd., in their respective capacities as trustees of the estate of Harold K.L. Castle, deceased, and the Harold K.L. Castle Foundation (hereinafter collectively Castle) from various judgments of the first circuit court in favor of the plaintiff-appellee Housing Finance and Development Corporation (HFDC) and against Castle. The judgments, in substance, reaffirmed the constitutionality of the HLRA by ruling that the HFDC's condemnation of the leased fee interests in a number of residential houselots, located in a number of subdivisions in the City and County of Honolulu, accomplished a public purpose within the meaning of the HLRA and the United States and Hawai'i Constitutions.

For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

### A. *Appeal No. 16241 (Kalaheo Hillside/Kalaheo Village)*

On June 25, 1991, in Civil No. 90–0679, the HFDC filed a second amended complaint in

---

1. [The HLRA] allows eligible owners [*see* HRS § 516–33 (Supp.1992 & 1993 Comp.)] of long-term leased interests in residential lots the opportunity to obtain fee simple title to the land [*see* HRS § 516–21 (1985 & Supp.1992)]. Only lots which are a maximum of two acres [*see* HRS § 516–1 (Supp.1992), defining "lot," "houselot," "residential lot," and "residential houselot"], on a development tract not less than five acres [*see id.*], and with a lease of twenty years or more [*see id.*] are eligible for conversion. Once the qualifications for conversion are met, the lessees may petition the [Housing Finance and Development Corporation (HFDC)] [*see* HRS § 516–21 (Supp. 1992), which, via 1987 Haw.Sess.L.Act 337, § 16 at 1094, and 1988 Haw.Sess.L.Act 104, § 2 at 165, transferred the functions of the Hawai'i Housing Authority to the HFDC for purposes of administering the HLRA] to condemn the property [*see* HRS § 516–22 (Supp.1992)]. If the lesser of twenty-five eligible tenants or half of the tenants of lots on the tract file applications, the [HFDC] will hold a public hearing to determine whether acquisition by the State of all or part of the tract will "effectuate a public purpose" [*see id.*]. If the [HFDC] finds that the public purpose will be served, it is authorized to use eminent domain proceedings to acquire the lease[d] fee interest in the designated tract [*see* HRS §§ 516–23 (1985 & Supp.1992) and 516–25 (1985 & Supp.1992)].

   The price of the converted lot will either be negotiated by the lessor and the lessee or set at an eminent domain trial [*see* HRS § 516–56 (Supp.1992)]. In any event, the amount to be paid by the lessor will not be less than the fair

market value of the lot [*see* HRS § 516–1, defining "owner's basis"]. After determining the price, [the HFDC] may sell the lot to the qualifying tenant; if the tenant cannot afford to purchase the lot, [the HFDC] may lend up to ninety percent of the purchase price [*see* HRS §§ 516–34 (1985 & Supp.1992) and 516–35 (1985 & Supp.1992)]. As an alternative to conversion, [the HLRA] provides safeguards for lessees who continue under long term leases. Among the provisions are free assignability of the leasehold interest by the lessee without the consent of the lessor [*see* HRS § 516–63 (Supp.1992)]; rent control [*see* HRS § 516–66 (1985)]; and the reversion to the lessee of any improvements to the lot [*see* HRS § 516–70 (1985)].

Comment, *Extending Land Reform to Leasehold Condominiums in Hawai'i,* 14 U.Haw.L.Rev. 681, 684–85 (1992) (footnotes omitted).

2. The fifth amendment to the United States Constitution provides in relevant part: "nor shall private property be taken for public use, without just compensation." The "public use" clause of the fifth amendment is made applicable to the states through the fourteenth amendment to the United States Constitution. *Hawai'i Housing Authority v. Midkiff,* 467 U.S. 229, 231, 104 S.Ct. 2321, 2324, 81 L.Ed.2d 186 (1984).

3. Article I, section 20 of the Hawai'i Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation."

eminent domain seeking to condemn sixty-eight houselots in the Kalaheo Hillside Subdivision pursuant to the HLRA. On the same day, in Civil No. 90–0680, the HFDC filed a second amended complaint similarly seeking to condemn forty-two houselots in the Kalaheo Village Subdivision. The two complaints were consolidated by order of the circuit court on January 15, 1992.

On June 5, 1992, the HFDC filed a motion for partial summary judgment, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990), on the ground that there was no genuine issue of material fact regarding the proper designation of, and public purpose underlying, acquisition of the Kalaheo houselots by the HFDC in accordance with the HLRA and that, as a matter of law, the HFDC was therefore entitled to partial summary judgment with respect thereto. The circuit court granted the motion on July 2, 1992, and Castle filed a timely notice of appeal.

### B. *Appeal No. 16293* [4]

#### 1. *Maunawili*

On January 30, 1991, in Civil No. 91–0320, the HFDC filed a complaint in eminent domain seeking to condemn twenty-two houselots in the Maunawili Subdivision. On April 29, 1991, the HFDC filed a motion for partial summary judgment identical in substance to that filed in Appeal No. 16241. The circuit court granted the motion on August 14, 1991.

On May 18, 1992, Castle filed an HRCP 59(e) motion to alter or amend the partial summary judgment and to dismiss the HFDC's complaint based upon the alleged absence of any public purpose justifying the exercise of the state's power of eminent domain. The circuit court entered an order denying Castle's motion on July 2, 1992, and Castle filed a timely notice of appeal.

#### 2. *Olomana/Pohakupu/Kukanono*

On February 4, 1991, in Civil No. 91–0355, the HFDC filed a complaint in eminent domain seeking to condemn forty-six lots in the

Pohakupu/Kukanono Subdivision pursuant to the HLRA. On April 1, 1991, in Civil No. 90–3750, the HFDC similarly filed a first amended complaint seeking to condemn thirty-two lots in the Olomana Subdivision. The parties subsequently agreed by stipulation to consolidate the two complaints for discovery and trial. (Hereinafter, the consolidated actions and the subject properties will be referred to collectively as "Olomana.")

On February 26, 1992, the HFDC filed a motion for partial summary judgment with respect to the Olomana lots that was identical in substance to those filed in Appeal No. 16241 and the Maunawili action. Following an evidentiary hearing on the issue of public purpose, the circuit court initially denied the HFDC's motion for partial summary judgment; nevertheless, on June 12, 1992, the circuit court entered findings of fact, conclusions of law, and a judgment ruling, *inter alia*, that the condemnation of the Olomana lots was for a public use within the meaning of the HLRA and HRS ch. 101 (1985 & Supp.1992), relating to "eminent domain." Castle timely appealed to this court.

#### 3. *Pikoiloa*

On February 8, 1991, in Civil No. 91–0415, the HFDC filed a complaint in eminent domain seeking to condemn thirty-five lots in the Pikoiloa Subdivision. On March 31, 1992, the HFDC filed a motion for partial summary judgment identical in substance to those filed in Appeal No. 16241 and the Maunawili and Olomana actions, but withdrew it on April 27, 1992. Following evidentiary hearings on the issue of public purpose, the circuit court entered findings of fact, conclusions of law, and a judgment on June 30, 1992, ruling, *inter alia*, that the condemnation of the Pikoiloa lots was for a public use within the meaning of the HLRA and HRS ch. 101. Castle filed a timely notice of appeal to this court.

### C. *Appeal No. 16625 (Keapuka II)*

On February 27, 1991, in Civil No. 90–3275, the HDFC filed a first amended com-

---

4. By order dated September 18, 1992, we consolidated Appeal No. 16293 (Olomana/Pohakupu/Kukanono) with Appeal Nos. 16314 (Maunawili) and 16315 (Pikoiloa). The three appeals were thenceforth denominated Appeal No. 16293.

plaint in eminent domain seeking to condemn thirty-four lots in the Keapuka II Subdivision. On February 14, 1992, the HDFC filed a motion for partial summary judgment identical in substance to those filed in Appeal Nos. 16241 and 16293. The circuit court granted the motion on April 22, 1992, and, on October 20, 1992, entered findings of fact, conclusions of law, and a judgment, ruling, *inter alia*, that the condemnation of the Keapuka II lots was for a public use within the meaning of the HLRA and HRS ch. 101. Once again, Castle timely appealed.[5]

## II. *STANDARDS OF REVIEW*

■ "On appeal, an award of summary judgment is reviewed under the same standard applied by the trial courts. Under [HRCP] Rule 56(c), summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Dawes v. First Ins. Co. of Hawai'i, Ltd.*, 77 Hawai'i 117, 121, 883 P.2d 38, 42, *reconsideration denied*, 77 Hawai'i 489, 889 P.2d 66 (1994) (quoting *Sol v. AIG Hawai'i Ins. Co.*, 76 Hawai'i 304, 306, 875 P.2d 921, 923, *reconsideration denied*, 76 Hawai'i 353, 877 P.2d 890 (1994)).

■ A conclusion of law (COL) entered pursuant to a final judgment

is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews COLs under the right/wrong standard. Thus, a COL

that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned.

*State v. Schroeder*, 76 Hawai'i 517, 523, 880 P.2d 192, 198 (1994) (citations, internal brackets, and internal quotation marks omitted).

... The constitutionality of a statute is a question of law which is reviewable under the right/wrong standard. Additionally, where it is alleged that the legislature has acted unconstitutionally, this court has consistently held that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. The infraction should be plain, clear, manifest, and unmistakable.

*State v. Gaylord*, 78 Hawai'i 127, 137, 890 P.2d 1167, 1177 (1995) (quoting *State v. Lee*, 75 Haw. 80, 90–91, 856 P.2d 1246, 1253 (1993)).[6] *See also Lyman*, 68 Haw. at 71, 704 P.2d at 898 (citation omitted).

## III. *DISCUSSION*

A. *Pursuant To HRS § 101–34, This Court Has Jurisdiction Over An Appeal From A Summary Judgment On The Issue Of Public Use.*

■ Castle primarily relies upon HRS § 101–34 (1985)[7] as the jurisdictional basis for its appeal in No. 16241.[8] HRS § 101–34 provides in relevant part:

HRS §§ 516–21 through 516–56 (1985 & Supp. 1992), relating to 'condemnation of development tract')], the [HDFC] shall exercise its power of eminent domain in the same manner as provided in [HRS] chapter 101." Thus, in the context of a condemnation proceeding within the purview of the HLRA, this court has recognized that "HRS § 101–34 expressly provides that if the landowner properly raised the question of whether there is a public use, the issue can be separated out and tried and indeed *appealed* in advance of the valuation trial." *Takabuki v. Housing Fin. and Dev. Corp.*, 72 Haw. 466, 467–68, 822 P.2d 955, 956 (1991) (emphasis added).

---

5. Prior to oral argument, this court consolidated Appeal Nos. 16625, 16293, and 16241.

6. "Such presumptive constitutionality does not apply for purposes of equal protection analysis in the case of statutes, which on their face classify on the basis of suspect categories such as race or sex. *See Baehr v. Lewin*, 74 Haw. [530, 571–72], 645, 852 P.2d 44, 63–64, *reconsideration [granted in part]*, 74 Haw. 650, 875 P.2d 225 (1993)."
*State v. Gaylord*, 78 Hawai'i 127, 137 n. 18, 890 P.2d 1167, 1177 n. 18 (1995) (quoting *State v. Lee*, 75 Haw. 80, 91 n. 4, 856 P.2d 1246, 1254 n. 4 (1993)) (brackets in original).

7. The provisions of HRS ch. 101, relating generally to eminent domain proceedings, are made directly applicable to the HLRA pursuant to HRS § 516–23, which provides in relevant part that "[e]xcept as otherwise provided in this part [*i.e.,*

8. The issue of appellate subject matter jurisdiction is not relevant to Appeal Nos. 16293 and 16625.

**Issue as to use may be set for immediate trial.** If the defendant ... denies that the use for which the property sought to be condemned is a public use, ... the issue may, upon the motion of any party, be set for immediate *trial,* without a jury and without regard to position on the calendar. Notwithstanding any provision of [HRS §] 641–1 [generally governing appeals of right and interlocutory appeals in civil cases], *an interlocutory appeal shall lie from the decision on the issue as of right ....*

(Emphasis added.) In its answering brief, the HFDC agrees that this court has jurisdiction to consider Appeal No. 16241.

■ Nevertheless, [j]urisdiction is the base requirement for any court considering and resolving an appeal or original action. Appellate courts, upon determining that they lack jurisdiction ... shall not require anything other than a dismissal of the appeal or action. Without jurisdiction, a court is not in a position to consider the case further.

*Pele Defense Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 69 n. 10, 881 P.2d 1210; 1215 n. 10 (1994). Thus, "[a]ppellate courts have an obligation to insure [that] they have jurisdiction to hear and determine each case." *Kernan v. Tanaka,* 75 Haw. 1, 15, 856 P.2d 1207, 1215 (1993), *cert. denied,* — U.S. —, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994) (citation omitted). *See also Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 119, 869 P.2d 1334, 1338 (1994). The "lack of subject matter jurisdiction can never be waived by any party at any time." *Chun v. Employees' Retirement Sys.,* 73 Haw. 9, 14, 828 P.2d 260, 263, *reconsideration denied,* 73 Haw. 625, 829 P.2d 859 (1992) (citation omitted). Accordingly, "[w]hen we perceive a jurisdictional defect in an appeal, we must, *sua sponte,* dismiss that appeal." *Familian Northwest, Inc. v. Central Pac. Boiler & Piping, Ltd.,* 68 Haw. 368, 369, 714 P.2d 936, 937 (1986) (citations omitted).

The presence or absence of subject matter jurisdiction over Appeal No. 16241, pursuant to HRS § 101–34, turns on the meaning of the statutory term "trial" and whether it encompasses proceedings upon a motion for summary judgment. In common legal parlance, motions for summary judgment are considered "pre-trial proceedings"; the proceedings progress to "trial" for fact finding and entry of judgment when the court has denied a party's motion for "summary" judgment. On the other hand, "[t]he word 'trial' is not a word of rigid definition[,] and it must be read in the context in which it is used." *Keaulii v. Simpson,* 74 Haw. 417, 423, 847 P.2d 663, 666, (citing, *inter alia, Jones v. Houston Materials Co.,* 477 S.W.2d 694 (Tex. Civ.App.1972) as illustrative of circumstances in which "summary judgment proceedings" and "trial" may be indistinguishable), *reconsideration denied,* 74 Haw. 650, 853 P.2d 542, *cert. denied,* — U.S. —, 114 S.Ct. 61, 126 L.Ed.2d 31 (1993).

Indeed, the term "trial" may be construed quite broadly. The primary definition of "trial" set forth in *Black's Law Dictionary* 1504 (6th ed. 1990) is "[a] judicial examination and determination of issues between parties to [an] action, whether they be issues of law or of fact, before a court that has jurisdiction." *Cf. Hamano v. Miyake,* 24 Haw. 12, 14 (1917) ("At common law the word 'trial' meant the examination of the evidence and decision upon issues of fact."); *Lorenzen v. The Clavering,* 2 U.S.Dist.Ct. Haw. 32 (D.Haw.1904) ("trial" is formal investigation and decision of matter in issue between parties before competent tribunal). Thus, trials and proceedings on motions for summary judgment may share certain identical characteristics. For example,

[a] summary judgment is analogous to a directed verdict [at trial]. The theory underlying a motion for summary judgment is substantially the same as that underlying a motion for a directed verdict. In both instances the movant is asserting that there is no genuine issue of material fact to be resolved by the factfinder and that [the movant] is entitled to judgment on the merits as a matter of law.

*Fry v. Bennett,* 59 Haw. 279, 280, 580 P.2d 844, 846 (1978) (per curiam) (citations omitted). *See also State v. Midkiff,* 49 Haw. 456, 459, 421 P.2d 550, 553 (1966).

■ In interpreting the term "trial" as employed in HRS § 101–34, "[t]he funda-

mental starting point ... is the language of the statute itself." *AIG Hawai'i Ins. Co. v. Estate of Caraang*, 74 Haw. 620, 633, 851 P.2d 321, 328 (1993) (citation and internal quotation marks omitted). "The interpretation of a statute is a question of law which this court reviews *de novo*." *State v. Ramela*, 77 Hawai'i 394, 395, 885 P.2d 1135, 1136 (1994) (citation omitted). "Moreover, where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." *Id.* (citation and internal quotation marks omitted). "When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Crosby v. State Dep't. of Budget & Finance*, 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994), *cert. denied sub nom.*, *Crosby v. Hawai'i*, ── U.S. ──, 115 S.Ct. 731, 130 L.Ed.2d 635 (1995) (citation and internal quotation marks omitted). And "[w]e must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." *Franks v. City and County of Honolulu*, 74 Haw. 328, 335, 843 P.2d 668, 671 (1993) (citation omitted).

■■■■■ " 'When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute[,] an ambiguity exists.' " *Mehau v. Reed*, 76 Hawai'i 101, 109, 869 P.2d 1320, 1328 (1994) (quoting *Franks*, 74 Haw. at 335, 843 P.2d at 671). Put differently, a statute is ambiguous if it is "capable of being understood by reasonably well-informed people in two or more different senses." 2A N. Singer, *Sutherland Statutory Construction* § 45.02 at 6 (5th ed. 1992). Based on the foregoing analysis, we believe that the term "trial," as utilized in HRS § 101–34, is ambiguous because it is capable of being understood in different senses, thereby injecting doubt or uncertainty into the statute.

■■■■■ In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) (1985). Moreover, "[t]he courts may resort to extrinsic aids in determining the legislative intent." *State v. Mundell*, 8 Haw. App. 610, 616, 822 P.2d 23, 27 (citing *Crawford v. Financial Plaza Contractors*, 64 Haw. 415, 643 P.2d 48 (1982)), *cert. denied*, 72 Haw. 619, 841 P.2d 1075 (1991). One avenue is the use of legislative history as an interpretive tool. *Pacific Int'l Services Corp. v. Hurip*, 76 Hawai'i 209, 217, 873 P.2d 88, 96 (1994); *Franks*, 74 Haw. at 335, 843 P.2d at 671–72.

The legislative history underlying HRS § 101–34 reveals a dual purpose of expediting both the initial judicial determination of the issue of public use and the subsequent interlocutory appeal of disputed decisions to this court. When the statute was first enacted in 1951 as RLH § 8–32 (1955), the Senate Judiciary Committee noted that "[a]mong other things the bill ... [a]dds a new provision to the present eminent domain procedural sections which will expedite trials and appeals to the Supreme Court where there is a dispute as to whether the use for which the property is proposed to be taken is a public ... use." Sen.Stand.Rep. No. 176, in 1951 Senate Journal, at 541. In 1973, HRS § 101–34 was amended to "give[ ] the defendant, as a matter of right, an interlocutory appeal from an adverse decision on the issue as to [public] use[.]" Hse.Stand.Comm.Rep. No. 19, in 1973 House Journal, at 753. Inasmuch as the expressly stated purpose of HRS § 101–34 is to expedite judicial decisions and appeals in eminent domain proceedings when public use is at issue, it would be nonsensical to read into the statute a prohibition against interlocutory appeals from summary judgments. Such a narrow construction of the statutory term "trial" would defeat the manifest intent of HRS § 101–34.

The appealability of summary judgments pursuant to HRS § 101–34 is implicit in the holding of this court in *Hawai'i Housing Authority v. Castle*, 65 Haw. 465, 653 P.2d 781 (1982) (per curiam) (*Castle I* ). The relevant procedural background in *Castle I* is identical to that of Appeal No. 16241. Specifically, the Hawai'i Housing Authority, the statutory predecessor of the HFDC, *see su-*

*pra* note 1, commenced an eminent domain proceeding to acquire the leased fee interests of the lessor/landowner trustees of the Castle estate on behalf of the lessees of certain residential lots located in the City and County of Honolulu. The trustees moved for partial summary judgment on the issue of public use, and the circuit court granted the motion. The trustees appealed to this court pursuant to HRS § 101–34, contesting the proposition that a taking by eminent domain under the provisions of the HLRA is a "public use" within the meaning of that term as employed in the fifth amendment to the United States Constitution and article I, section 20 of the Hawai'i Constitution.

Significantly, this court did not dismiss the trustees' appeal *sua sponte* for lack of subject matter jurisdiction, as it would have been compelled to do if such jurisdiction were lacking. *See Familian Northwest, Inc.*, 68 Haw. at 369, 714 P.2d at 937; *see also Jenkins*, 76 Hawai'i at 119, 869 P.2d at 1338; *Kernan*, 75 Haw. at 15, 856 P.2d at 1215. Rather, inasmuch as the trustees' appeal preceded the holding of the United States Supreme Court in *Midkiff* and this court's holding in *Lyman, see infra* section II.B.3, and the trustees' appeal challenging the constitutionality of the HLRA was the first to come before us, we deemed the case to be one of both "vast public import" and "first impression." *Castle I*, 65 Haw. at 466, 653 P.2d at 782–83. Accordingly, we declined to decide the constitutionality of the HLRA in the absence of a developed record and remanded the matter for trial.

■■■ "Where the particular point was essential to the decision, and the appellate judgment could not have issued without its determination, a necessary conclusion is that the point was impliedly decided, even though the point was not raised by counsel or expressly mentioned." *Lindsey v. Meyer*, 125 Cal.App.3d 536, 541, 178 Cal.Rptr. 1, 3 (1981). On that basis, *Castle I* is strong authority for the existence of subject matter jurisdiction in Appeal No. 16241. We therefore hold that this court has subject matter jurisdiction to decide an appeal from an order granting partial summary judgment on the issue of public use in furtherance of the purposes of HRS § 101–34.

B. *The Hawai'i Land Reform Act Continues To Comport With The "Public Use" Clauses Of The Fifth Amendment To The United States Constitution And Article I, Section 20 Of The Hawai'i Constitution.*

■■■ Castle urges in each of these consolidated appeals that the circuit court erred in ruling that the condemnation of its leased fee interests in the subject residential houselots satisfies the "public use" prerequisites of the fifth amendment to the United States Constitution and article I, section 20 of the Hawai'i Constitution. However, the public purposes elucidated in the express language of the HLRA,[9] the legislative history underlying it, and the relevant case law demonstrate otherwise.

1. *The express language of the HLRA*

HRS § 516–83 (1985), which was enacted in 1975, *see* 1975 Haw.Sess.L. Act 186, § 2 at 424–427, provides in relevant part:

**Legislative findings and declaration of necessity; purpose.** (a) The legislature finds that:

(1) There is a concentration of land ownership in the State in the hands of a few landowners who have refused to sell the fee simple titles to their lands and who have instead engaged in the practice of leasing their lands under long-term leases;

(2) The refusal of such landowners to sell the fee simple titles to their lands and the proliferation of such practice of leasing rather than selling land has resulted in a serious shortage of fee simple residential land and in an artificial inflation of residential land values in the State;

(3) Due to such shortage of fee simple residential land and such artificial in-

---

9. The legislature has provided that "[t]he reason and spirit of [a] law, and the cause which induced the legislature to enact it, may be considered" in ascertaining its intended purpose. HRS § 1–15(2) (1985).

flation of residential land values, the people of the State have been deprived of a choice to own ·or take a lease of the land on which their homes are situated and have been required instead to accept long-term leases of such land which contain terms and conditions that are financially disadvantageous, that restrict their freedom to fully enjoy such land[,] and that are weighted heavily in favor of the few landowners of such land;

(4) The economy of the State and the public interest, health, welfare, security, and happiness of the people of the State are adversely affected by such shortage of fee simple residential land and artificial inflation of residential land values and by such deprivation of the people of the State of the choice to own or take a lease of the land on which their homes are situated and the required acceptance of such long-term leases of such lands;

. . . .

(8) The right to own land is not an irrevocable grant of a special privilege where it operates against the general welfare of the many for the particular benefit of the few;

(9) Land, in common with other natural resources, is of finite quantity; a fact particularly obvious in [Hawai'i]. In recent decades there has been growing general agreement that the wise conservation, preservation, use[,] and management of exhaustible natural resources such as land are matters mandating an active governmental role. There is an intimate relationship between the monetary values accorded land in [Hawai'i] and the stability and strength of the State's economy as a whole. Land values, artificially inflated by the high concentration of ownership, skew the State economy toward unnecessarily high levels. The pervasive and substantial contribution made to inflation by high land values creates a potential for economic instability and disruption. Economic inflation, instability[,] and disruptions have real and potential[ly] damaging consequences for all members of an affected society. Checking inflation, improving the stability of the economy, and forestalling disadvantageous economic disruptions all are productive of general benefit to all members of the Hawaiian society. The sound and wise conservation, preservation, use[,] and management of land cannot be separated from the subject of patterns of land ownership. To accomplish the public purposes of wisely conserving, preserving, using, and managing the land in the State requires changing present patterns of land ownership. Public laws, expenditures, programs, and policies which contribute to the realization of these public purposes serve a public use since they ultimately benefit the entire community. Changing present patterns of land ownership by allowing lessees under long-term leases of residential land to purchase in fee simple, absolute or otherwise, the land on which their homes are situated, through governmental intervention including exercise of the power of eminent domain to acquire fee simple title to such land ... will help satisfy the pressing public necessity for a secure, strong[,] and stable economy;

(10) The State's acquisition of residential lands held in fee simple, through the exercise of the power of eminent domain, for the purposes of this chapter is for the public use and purpose of protecting the public safety, health[,] and welfare of all people in [Hawai'i];

(11) Inflation lessens the quality of life of all members of this afflicted society and is particularly invidious in its impact on the 90 plus [percent] of the population who are in the poverty[ ] and low through middle income groups. The State has limited abilities to curb inflation[,] and, perhaps, the only useful means available is the State's power to control land values. There is a pressing public necessity for the State to do whatever it can to curb inflation and to keep the cost of

living at a level where it is possible and manageable to provide all citizens a decent and healthful standard of life. The public use and purpose of providing all citizens a decent and healthful standard of life will be directly and substantially furthered by the State's acquisition of residential lands held in fee simple, through the exercise of the power of eminent domain, for the purposes of this chapter;

(12) The use of the power of eminent domain to condemn the fee simple title to residential land and the payment of just compensation therefor for the purpose of making the fee simple title thereto and the use thereof available for acquisition by people who are lessees under long-term leases of such land and on which such land their homes are situated is for a public use and purpose;

(13) Legislation providing to people[,] who are lessees under long-term leases of residential land on which their homes are situated[,] the ability to fully enjoy such land through ownership of such land in fee simple, absolute or otherwise, is for a public purpose.

(b) It is therefore declared to be necessary[,] and it is the purpose of this chapter[,] to alleviate the conditions found in subsection (a) of this section ... by providing for the condemnation of the fee simple title to such land and the payment of just compensation ... through the use of the power of eminent domain....

Thus, through HRS § 516–83, the legislature found and declared that the ownership of residential land in Hawai'i was concentrated in a few landowners who lease their land rather than sell it. This concentration, plus the refusal to sell, created a shortage of fee simple land for residential use, as well as the artificial inflation of land values. Inflation and the shortage of residential land forced Hawai'i citizens to lease the land under their homes at disadvantageous terms. The resulting state of affairs not only affected the economy adversely, but also the health, welfare, security, and happiness of the people of the state.

Allowing Hawai'i citizens to purchase the fee simple title to the land under their homes, the legislature found, would assist in alleviating negative impacts on the state's economy and would augment the health, welfare, security, and happiness of the people. Furthermore, stabilization of land values would ameliorate the state's general inflation rate and the escalating cost of living, thus facilitating a rise in the overall standard of living. For the foregoing reasons, the legislature declared that the state's exercise of the power of eminent domain over residential land and the payment of just compensation therefor in order to redistribute and proliferate fee simple ownership of such land furthered a public use and purpose.[10]

---

10. The legislature's findings and declarations regarding the public necessity and purposes underlying the HLRA, as recited in HRS § 516–83, were reenforced by 1975 Haw.Sess.L.Act 184, at 408–19, which was enacted simultaneously with HRS § 516–83 and amended a number of sections of the HLRA. Of particular relevance to the present discussion is section 1—the preliminary "findings and purpose" section of Act 184—, which elaborated upon the legislature's perception of the economic and social evils of the residential leasehold (*i.e.*, leased fee) system that the HLRA was intended to ameliorate. Section 1 provided in relevant part:

(d) *Residential leaseholds have had and continue to have* the following *undesirable economic effects:*
(1) The scarcity of fee simple residential lands have pushed the price of fee simple residential units to high levels;
(2) The high levels of fee simple residential unit prices have artificially raised the level of prices for leasehold units;
(3) The high prices commanded for leasehold units have encouraged the development of leasehold residential units and discouraged the development of fee simple units;
(4) The increases in the price for both fee simple and leasehold residential lands have caused lease rentals to increase on renegotiation of rentals (on the expiration of 25 or 30 years of initial fixed rent periods) ranging from 400 per cent to 1000 per cent, for renegotiated lease rentals are invariably tied to the fee simple value of the land on which the leasehold residences are situated, and these new lease rentals have at times exceeded the amount of the payments that the lessee had been making on the leasehold mortgages;

Accordingly, the intent of the legislature in enacting the HLRA, as reflected in the plain language of the HLRA, could not be clearer.

### 2. *Relevant legislative history*

The legislative history underlying the original enactment of the HLRA in 1967, *see* 1967 Haw.Sess.L. Act 307, §§ 1 through 46 at 488–503, likewise emphasized the public purpose driving the contemplated exercise by the state of the power of eminent domain:

> The primary purpose of [the HLRA] is to provide means by which the lessees of residential leasehold lots may become vested with the fee simple title to their lots.
>
> . . . .
>
> . . . [The] virtual monopoly over privately held lands . . . had its beginnings in the days of the Hawaiian monarchy when all the lands in [Hawai'i] were owned by the kings and chiefs and [a] few others to whom the kings and chiefs parceled out parts of the lands. Over the years, the lands held by the kings and chiefs and the few people passed into the hands of the small number of present day owners.
>
> Although this pattern of land ownership (that is, the concentration of ownership in

the hands of a few) may have suited the needs of the people of ancient [Hawai'i], it no longer meets the needs of the people of modern [Hawai'i]. [Hawai'i] has been in the throes of great economic boom, population increase, and social and political changes, especially since the advent of statehood. Much of this change has been taking place in the urban areas of [O'ahu] where the few landowners own a bulk of the private lands.

> The changing nature of our economic, social[,] and political society has caused pressures to rise for residential houselots. The few landowners have made some of their lands available for development into residential lots. However, their efforts have not relieved these pressures, since their practice has been to lease, rather than sell in fee simple, the lots developed on their lands.
>
> The preference of fee simple ownership over leaseholds has been demonstrated in different areas and particularly in recent times. . . .
>
> . . . .
>
> Owning property, especially real property on which one lives, together with all of

> (5) Rental renegotiations have strongly favored the lessor, the lessee having little option but to consent to such rental as determined by the lessor or to give up the leasehold and home, although the lease may yet have 25 or more years to run; and
> (6) The inequality of bargaining power has allowed lessors to charge lease rent based not only on the raw land value of the property but also on the value of the offsite and onsite improvements which have already been paid for or will be paid for by the lessee and on the value accruing thereon; [and]
> (7) The high increases in lease rentals have caused leasehold values to drop after the initial fixed rent period . . ., causing lessees opting to dispose of their leasehold interests to suffer severe economic losses.
> (e) *Residential leaseholds have also undesirable social effects.* Lease rent negotiations are usually scheduled every 10 to 15 years after the initial fixed rent period of 25 to 30 years. Thus, as the lessee advances in age and his [or her] income potential declines, his [or her] lease rentals increase, causing him [or her] to give up the lease and to look for other accommodations. Then, when the entire lease period expires, the lessee who has stayed on the leasehold for the full term of the lease is, by reason of age, income, and the lack of value remain-

> ing in the leasehold, left without means to purchase another home. These situations aggravated the already acute need for government-sponsored low and middle income and elderly housing. With the increasing number of elderly in this State, the problem promises to become even more acute in the foreseeable future, and will adversely affect the health and welfare of these people and the general welfare of the people of the State of [Hawai'i].
> *The legislature further finds and declares:*
> (1) *That the land in [Hawai'i] is to be considered as a source of life, dignity, and economic freedom for the men and women who reside on it;* [and]
> (2) *That it is the policy of the State that each person shall have the right of ownership of the land on which he [or she] makes his [or her] home* [.]

1975 Haw.Sess.L.Act 184, § 1 at 408–09 (emphasis added). Thus, it is apparent that the legislature considered the residential leased fee system, in and of itself, to be pernicious and that its ultimate, substantial abolition, via the implementation of the HLRA, would further a public purpose. So construed, the HLRA constitutes nothing less than a full-blown declaration of war on the substantial continued existence of residential leased fee interests.

its legal and equitable rights, is an American dream. Consistent with *the promotion of the public welfare through the attainment of fee simple ownership of residential lots by the greatest number of people,* the federal government has for many years made available ... loan guarantee[s] and ... programs to enable the masses to buy that dream....

. . . .

The retention of ownership of lands by the large landowners, their practice of leasing the residential lots developed on their lands, the resultant failure of the supply to catch up with the demand for fee simple residential lots, and the high cost of land have affected not only the residential market but also the cost of other goods consumed by the people of [Hawai'i]. Thus, *it is clear that the oligopolistic hold on lands by a few is contrary to the economic, social[,] and political well-being of the people of the State.* This awesome monopolistic advantage should be no less checked than those in industry checked by our federal and state anti-trust laws. This situation is inimical to the public health, welfare[,] and happiness of our people.

. . . .

Legislation is necessary for the protection of lessees. The ability of the lessees to enjoy fully their leasehold estates and the enactment of legislation designed to promote this full enjoyment are indeed in the public interest, welfare, security[,] and happiness of [Hawai'i's] citizens.

Sen.Conf.Comm.Rep. No. 19 (Majority), in 1967 Senate Journal, at 799–802 (emphasis added); Hse.Conf.Comm.Rep. No. 18 (Majority), in 1967 House Journal, at 858–861 (emphasis added).

Thus, from the outset, the legislative history of the HLRA reflects the following conceptual threads from which the legislature has never retreated: (1) the oligopolistic control of fee simple ownership of residential land in Hawai'i is a peculiar historical anomaly derived from a monarchical past unmirrored anywhere else in the United States; (2) this unique pattern of land ownership has become dysfunctional in post-statehood Hawai'i because of an ever increasing demand for affordable residential houselots, which the residential leased fee system has proved unable to ameliorate in any acceptable way; (3) the residential leased fee system has produced adverse statewide economic consequences that transcend the residential market and is therefore incompatible with the economic, social, and political well-being of the state; (4) the monopolistic character of the residential leased fee system being inimical to the public health and welfare, the need for corrective measures parallels that giving rise to the anti-trust laws; (5) such corrective measures can be assured only through legislation; (6) the preference for fee simple ownership of residential houselots over leasehold ownership is central to the "American dream"; (7) the primary objective of the HLRA is the realization of this aspect of the "American dream"; and (8) for all of the foregoing reasons, the HLRA promotes the public interest, welfare, security, and happiness.[11]

### 3. *Relevant case law*

The constitutionality of the HLRA has been challenged and upheld by the United States Supreme Court, as well as this court. In *Hawai'i Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), the Court addressed the claims of the trustees of the estate of Bernice Pauahi Bishop (the trustees), who had initially sought a declaration in the United States District Court for the District of Hawai'i that the HLRA was unconstitutional, as well as an injunction against its enforcement. *Id.* at 234–35, 104 S.Ct. at 2325–26. Although the

---

11. The United States Supreme Court has acknowledged the legislative history described above without criticism.

[Through the HLRA], [t]he people of Hawai'i have attempted, much as the settlers of the original 13 Colonies did, to reduce the perceived social and economic evils of a land oligopoly traceable to their monarchs. The land oligopoly has, according to the [Hawai'i] Legislature, created artificial deterrents to the normal functioning of the State's residential land market and forced thousands of individual homeowners to lease, rather than buy, the land underneath their homes.

*Midkiff,* 467 U.S. at 241–42, 104 S.Ct. at 2330 (footnote omitted).

district court declared the compulsory arbitration and compensation provisions of the HLRA unconstitutional,[12] it ultimately held the remaining portions of the act to be a valid exercise of the "public use" clause of the fifth amendment to the United States Constitution.[13] *Id.* at 235, 104 S.Ct. at 2326. The United States Court of Appeals for the Ninth Circuit (one judge dissenting) reversed the judgment of the district court, concluding that the HLRA "was simply 'a naked attempt on the part of the state of [Hawai'i] to take the private property of A and transfer it to B solely for B's private use and benefit.'" *Id.* (quoting *Midkiff v. Tom,* 702 F.2d 788, 798 (9th Cir.1983)).

On appeal, a unanimous United States Supreme Court framed the question before it as

> whether the Public Use Clause of [the fifth] Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the State of [Hawai'i] from taking, with just compensation, title in real property from lessors and transferring it to lessees in order to reduce the concentration of ownership of fees simple in the State.

*Id.* at 231–32, 104 S.Ct. at 2324.

Answering the question in the negative, the Court ruled as follows:

> To be sure, the Court's cases have repeatedly stated that one person's property may not be taken for the benefit of another private person without a *justifying public purpose,* even though compensation be paid.... But where the exercise of the eminent domain power is *rationally related to a conceivable public purpose,* the Court has never held a compensated taking to be proscribed by the Public Use Clause.
>
> On this basis, we have no trouble concluding that the [HLRA] is constitutional.... Regulating oligopoly and the evils associated with it is a classic exercise of a State's police powers. We cannot disapprove of [Hawai'i's] exercise of this power.

Nor can we condemn as irrational the [HLRA's] approach to correcting the land oligopoly problem. The [HLRA] presumes that when a sufficiently large number of persons declare that they are willing but unable to buy lots at fair prices the land market is malfunctioning. When such a malfunction is signalled, the [HLRA] authorizes [the Authority] to condemn lots in the relevant tract. The [HLRA] limits the number of lots any one tenant can purchase and authorizes [the Authority] to use public funds to ensure that the market dilution goals will be achieved. This is a comprehensive and rational approach to identifying and correcting market failure.

Of course, this Act, like any other, may not be successful in achieving its intended goals. But whether *in fact* the provision will accomplish its objective is not the question: the constitutional requirement is satisfied if the state Legislature *rationally could have believed* that the Act would promote its objective. *When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings*—no less than debates over the wisdom of other kinds of socioeconomic legislation—*are not to be carried out in the federal courts.* Redistribution of fees simple to correct deficiencies in the market determined by the state legislature to be attributable to land oligopoly is a rational exercise of the eminent domain power. Therefore, the [HLRA] must pass the scrutiny of the Public Use Clause.

. . . .

... [G]overnment does not itself have to use property to legitimate the taking; *it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause.*

. . . .

... [I]f a legislature, state or federal, determines there are substantial reasons for an exercise of the taking power, courts

---

**12.** The Hawai'i legislature later amended the HLRA to modify and/or delete the offending provisions. 1980 Haw.Sess.L.Act 107, §§ 1 through 4 at 155–57; 1983 Haw.Sess.L.Act 203, §§ 1 through 3 at 409–10; 1984 Haw.Sess.L.Act 157,

§ 1 at 288. *See also Midkiff,* 467 U.S. at 235 n. 3, 104 S.Ct. at 2326 n. 3.

**13.** *See supra* note 2.

must defer to its determination that the taking will serve a public use.

... The [Hawai'i] Legislature enacted its Land Reform Act ... to attack certain perceived evils of concentrated property ownership in [Hawai'i]—a legitimate public purpose. Use of the condemnation power to achieve this purpose is not irrational.

*Id.* at 241–45, 104 S.Ct. at 2329–32 (citations, footnote, internal quotation marks, and some brackets omitted) (some emphases in original and some added). Accordingly, the Court reversed the Ninth Circuit's judgment in favor of the trustees and sustained the constitutionality of the HLRA.

This court addressed the constitutionality of the HLRA for purposes of article I, section 20 of the Hawai'i Constitution [14] in *Hawai'i Housing Authority v. Lyman,* 68 Haw. 55, 704 P.2d 888 (1985). By way of background, the Hawai'i Housing Authority commenced a proceeding under the HLRA to condemn the leased fee interests in 257 houselots to which the Bishop estate held fee simple title for the benefit of the petitioning lessees, after the Authority had determined that the public purpose of the HLRA would be effectuated by the taking and had designated the lots for acquisition.[15] A bench trial, "necessitated by this court's opinion in [*Castle I* ]," [16] 68 Haw. at 66, 704 P.2d at 894, was conducted in the circuit court to determine whether the taking was for a "public use" under the United States and Hawai'i Constitutions, despite the fact that, mid-trial, the Ninth Circuit had declared the HLRA unconstitutional in *Midkiff. Midkiff v. Tom,* 702 F.2d 788 (9th Cir.1983).

The circuit court upheld the constitutionality of the HLRA. A final judgment in favor of the Authority and the lessees, incorporating the verdict returned in a subsequent "valuation" trial, was ultimately entered, and the trustees appealed to this court. During the pendency of the trustees' appeal, the United States Supreme Court rendered its decision in *Midkiff,* reversing the Ninth Circuit and upholding the constitutionality of the HLRA under the United States Constitution.

Thus, on appeal, we considered "the issue of whether the [HLRA] violate[d] the 'public use' requirement of article I, section 20 of the [Hawai'i] Constitution." *Lyman,* 68 Haw. at 67, 704 P.2d at 895. The trustees argued that the HLRA was "a thinly veiled attempt to divest large private landowners without an appreciable public benefit and, as such, permit[ted] the unconstitutional exercise of the state's condemnation powers for primarily private rather than public use." *Id.* We disagreed and held that the HLRA "passes the scrutiny of the public use clause" of the Hawai'i Constitution, *id.,* reasoning as follows:

Article I, section 20 ... may not be read to justify expropriation for a strictly private use or purpose. Legislative enactments authorizing such takings cannot pass constitutional muster and must be struck down.

However, the role of the courts in making the determination is necessarily limited by the separation of powers between the legislative and judicial branches. In the case at bar, the [Hawai'i] Legislature determined that disproportiona[te] concentrations of residential landholdings exist to the public detriment and that use of the sovereign's eminent domain powers to realign ownership patterns was for the public benefit, and therefore, a "public use". Accordingly, our inquiry must center upon the extent to which we may examine these declarations to determine whether in fact a public use exists and would be furthered by operation of the statute.

. . . .

When enacted, article I, section 20 of the [Hawai'i] Constitution was identical to the fifth amendment to the United States Constitution and was adopted because of the certainty given to the interpretation of the

---

**14.** *See supra* note 3.

**15.** *See supra* note 1.

**16.** The bench trial was "necessitated" because the question of "public use" was still one of first impression, *see Castle I,* 65 Haw. at 466, 653

P.2d at 782–83, and this court had yet to determine the HLRA's constitutionality. The parameters and scope of HRS § 101–34 bench trials on the issue of "public use" are discussed *infra* in Section III.B.4 of this opinion.

section by the federal decisions. Committee of the Whole Report No. 5, in 1 Proceedings of the Constitutional Convention of [Hawai'i] 1950 at 304 (1960). The two sections remain substantially similar. Consequently, the United States Supreme Court's interpretation of the federal public use clause as it applies to the [HLRA] is persuasive authority for our review of the [Hawai'i] constitutional provision.

However, we are not precluded from interpreting our state constitution to afford greater protection than that required by federal constitutional interpretations and have not hesitated to do so where warranted by logic and due regard for the purposes of those protections. We decline in this instance to embrace the Court's broader ruling in ... *Midkiff, supra,* equating the public use requirement of eminent domain with the state's police power. Rather, *our review is limited to an examination of the [HLRA's] constitutionality under the minimum rationality standard, which we adopt as appropriate for judicial evaluation of the legislature's public use determinations.*

... As the state legislature has primary authority for the exercise of the state's right of eminent domain, questions concerning the nature of the proposed use are, in the first instance, for the legislature to decide.

Designation of the types of activities to which condemned property is to be applied is a legislative declaration that such use is public, creating a judicial presumption of public use. *Where the legislature has gone further by promulgating specific findings and declarations of public use, these are entitled to great weight, indeed, to a prima facie acceptance of their correctness.*

Under these principles, courts are bound by the legislature's public use determination unless such use is clearly and palpably of a private character. As specified in *Hawai'i Housing Authority v. Chiyo Ajimine,* [39 Haw. 543 (1952)]:

[This] does not mean that either the decision of the legislature or the presumption is conclusive, for the issue of public use is a judicial question and one

of law to be decided on the facts and circumstances of each particular case. Nevertheless, the great weight accorded to the legislative finding and the prima facie acceptance of its correctness, as well as the binding effect of the presumption, demonstrates that the courts will not lightly disturb such a finding and will not overrule it unless it is manifestly wrong.

39 Haw. at 550. The courts will not invade the legislature's province unless, under the above principles, a clearly private taking is demonstrated.

*We therefore hold that once the legislature has spoken on the social issue involved, so long as the exercise of the eminent domain power is rationally related to the objective sought, the legislative public use declaration should be upheld unless it is palpably without reasonable foundation. The crucial inquiry is whether the legislature might reasonably ... have believed that application of the sovereign's condemnation powers would accomplish the public use goal.*

The [Hawai'i] Legislature, in comprehensive findings, determined that skewed patterns of land ownership have interfered with the normal functioning of the state's residential land market and declared that condemnation of certain concentrated private property interests would serve a public use by correcting the perceived social and economic evils of a land oligopoly. *Clearly, the legislature reasonably could have believed that condemnation and resale of the fee interest in leasehold land would promote the objectives of increasing the availability of residential property, realigning the residential fee simple market, reducing land prices, and would beneficially impact the state economy and general public welfare.*

*These are legitimate public purposes. The employment of the state's eminent domain authority to redistribute fees simple to correct socio-economic problems attributed by the legislature to a land oligopoly is a rational means to accomplish these ends.*

**86**

... If some conceivable public benefit may be realized, what is outwardly only a private transaction may be raised to a public affair. *The [HLRA] was designed to rectify a problem of public dimensions; it is not palpably without reasonable foundation.*

Every enactment of the legislature carries a presumption of constitutionality and must be judicially affirmed unless it has been shown beyond all reasonable doubt to be in violation of the constitution. Under the above articulated standard, the Trustees have failed to meet this burden. Accordingly, we defer to the state legislature's public use determination and uphold the constitutionality of the [HLRA] under the public use clause.

*Id.* at 67, 69–72, 704 P.2d at 895–98 (citations and footnotes omitted) (emphases added).

■ It is apparent that the test of the constitutionality of the HLRA is substantially the same as the least demanding level of equal protection analysis—"rational basis".

Under the rational basis test, the court essentially asks whether a statute rationally furthers a legitimate state interest. In making this inquiry, a *court will not look for empirical data in support of the statute. It will only seek to determine whether any reasonable justification can be conceived to uphold the legislative enactment. Nagle v. Board of Education,* 63 Haw. 389, 393, 629 P.2d 109, 112 (1981) (emphasis added); *accord Daoang v. Dept. of Education,* 63 Haw. 501, 504–05, 630 P.2d 629, 631 (1981).

Once it is determined that the legislature passed the statute at issue to further a legitimate government purpose, then "the pertinent inquiry is only whether the Legislature *rationally could have believed* that the [statute] would promote its objective." *In re Bacchus Imports, Ltd.,* 65 Haw. 566, 574, 656 P.2d 724, 730 (1982), *rev'd on other grounds sub nom., Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263 [104 S.Ct. 3049, 82 L.Ed.2d 200] (1984) (citation omitted) (emphasis in original). Additionally, *the lawmakers are under no obligation to convince the courts of the correctness of their legislative judgments.*

Rather, those challenging the legislative judgment must convince the court that the legislative facts on which the [statute] is apparently based *could not reasonably be conceived to be true* by the governmental decisionmaker.

*Id.* (citations omitted) (emphasis added). *Kaneohe Bay Cruises, Inc. v. Hirata,* 75 Haw. 250, 260–61, 861 P.2d 1, 7 (1993) (internal quotation marks, brackets, and ellipsis points omitted). *See also Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 516, 880 P.2d 169, 191 (1994). And, as *Midkiff* and *Lyman* demonstrate, both the United States Supreme Court and this court have already determined that the HLRA was enacted "to further a legitimate government [*i.e.,* public] purpose" and that the legislature "rationally could have believed" that the HLRA would promote its objectives of increasing the availability of residential property, realigning the residential fee simple market, reducing land prices, and beneficially impacting the state's economy and general public welfare.

#### 4. Continuing constitutionality of the HLRA

Castle contends, however, that "[n]either [*Midkiff* nor *Lyman* ] held that henceforth or forever into the future every condemnation of a leased fee pursuant to [the HLRA] would necessarily be for a public purpose." Suggesting that the legislature, pursuant to HRS § 516–22 (Supp.1992), and this court, through its pronouncements in *Castle I* and *Takabuki,* "have recognized that whether or not the condemnation of leased fees within a particular subdivision is for a public purpose will depend upon the facts of [the] particular case," Castle urges that condemnation of the lots in these consolidated appeals does not satisfy the constitutional prerequisite of "public use." Specifically, Castle explains that

[a]n ad hoc determination of public purpose for each successive subdivision is appropriate in view of the unusual nature of the use of the condemnation power set forth in [the HLRA]. In the typical condemnation action, public acquisition of the property satisfies the public purpose. In

[HLRA] condemnations, where the purpose of the statute is to alleviate high real estate prices by ending the concentration of fee simple ownership of residential houselots on a piecemeal basis, (i.e., subdivision by subdivision as initiated by petitions from lessees, [HRS] § 516–22), obviously the condemnation of the first leased fee would not accomplish this purpose by itself. Neither, obviously, would the condemnation of the last leased fee accomplish this purpose, for by then there could be no concentration of ownership. Whether or not the condemnation of leased fees continues to serve a public purpose as time goes on and circumstances change is a question that [HRS] § 516–22 explicitly refers to the [HFDC] for its determination on a case-by-case basis.

Castle is correct that the HLRA mandates "an ad hoc determination of public purpose for each successive subdivision." However, by proposing that case-by-case determinations of "public purpose" are to be made as a function of the particular "time" and general economic "circumstances" in which condemnation applications under the HLRA are filed, Castle's argument goes much further. In essence, Castle suggests that the HLRA can vacillate in and out of constitutionality depending upon the condition of the residential real estate market in Hawai'i at any given moment. It is apparent that Castle fundamentally misconstrues the legislative intent behind the HLRA as a whole, the function and mechanics of HRS § 516–22 in particular, and the significance of *Castle I* and *Takabuki.*

First, Castle ignores the basic fact that, *whatever* the extent of concentration of fee simple ownership of residential land in a small number of lessors may be at any particular time, the legislature has been unmistakable in its declared positions that: (1) leaseholds of residential houselots intrinsically produce "undesirable" economic and social effects in Hawai'i; *see* 1975 Haw.Sess.L.Act 184, § 1, at 408–09 (*supra* note 10); (2) residential land in Hawai'i is "a source of life, dignity, and economic freedom for the men and women who reside on it"; *id.* at 409; (3) each person should "have the right of ownership of the land on which he [or she] makes his [or her] home"; *id.;* (4) "[o]wning ... real property on which one lives, together with all of its legal and equitable rights, is an American dream"; *see* Sen.Conf.Comm.Rep. No. 19 (Majority), in 1967 Senate Journal, at 801; Hse.Conf.Comm.Rep. No. 18 (Majority), in 1967 House Journal, at 860; (5) "the primary purpose of [the HLRA] is to provide means by which the lessees of residential leasehold lots may become vested with the fee simple title to their lots"; *see* Sen. Conf.Comm.Rep. No. 19 (Majority), in 1967 Senate Journal, at 800; Hse. Conf.Comm.Rep. No. 18 (Majority), in 1967 House Journal, at 859; and, therefore, (6) the state's exercise of the power of eminent domain over residential land and the payment of just compensation therefor in order to redistribute and proliferate fee simple ownership furthers a public use and purpose; *see generally* HRS § 516–83; 1975 Haw.Sess. L.Act 184, § 1 at 408–09 (*supra* note 10).

Second, Castle misinterprets HRS § 516–22, which provides in relevant part:

**Designation of leased fee interest in all or part of development tract for acquisition.** *The [HFDC] may* designate all or a portion of a development tract for acquisition and *acquire leased fee interests in residential houselots* ... through the exercise of the power of eminent domain or by purchase under the threat of eminent domain *after* twenty-five or more *lessees* or the lessees of more than fifty per cent of the residential lease lots within the development · tract, whichever number is the lesser, *have applied* to the [HFDC] to purchase the leased fee interest in their residential lots *pursuant to [HRS §] 516–83* [ (Supp.1992 & 1993 Comp.) ] *and if,* after due notice and public hearing ..., the [HFDC] finds that *the acquisition* of the leased fee interest in [the] residential houselots in all or part of the tract through the exercise of the power of eminent domain or by purchase under threat of eminent domain and the disposition thereof, as provided in this part[,] *will effectuate the public purposes of [the HLRA].*

(Emphasis added.) Paraphrasing Castle, the issue becomes what it is precisely that HRS § 516–22 "explicitly refers to the [HFDC] for ... determination on a case-by-case basis."

■ In accordance with the plain and unambiguous language of HRS § 516–22, which we interpret *de novo* as a matter of law, *see Ramela,* 77 Hawai'i at 395, 885 P.2d at 1136, in the context of the entire statute and in a manner consistent with its purpose, *see Franks,* 74 Haw. at 334, 843 P.2d at 671, so as to ascertain and give effect to the intention of the legislature, *see Crosby,* 76 Hawai'i at 340, 876 P.2d at 1308, the HFDC may acquire leased fee interests, through the power of condemnation, in the residential houselots of all or part of a development tract if: (1) the lesser of twenty-five or more lessees or the lessees of more than fifty percent of the residential lease lots within the tract; (2) have applied to the HFDC to purchase their leased fee interests; (3) pursuant to the requisite qualifications of HRS § 516–33; and (4) the HFDC finds that the acquisition will effectuate the purposes of the HRLA.

Put more succinctly, pursuant to HRS § 516–22, the HFDC's sole function is to determine that the necessary *quantum* of lessees have *applied* for purchase of their leased fee interests in residential lots situated in a qualifying "development tract," *see* HRS § 516–1, *supra* note 1, in conformity with the preconditions enumerated in HRS § 516–33, and that the acquisition *by the HFDC* will *effectuate* the public purposes of the HLRA.

Castle does not contest, and the records before us clearly establish as to each of the condemnation actions at issue in these appeals, that the HFDC determined that the necessary quantum of lessees had applied for purchase of their leased fee interests in residential lots, situated in qualifying development tracts, in conformity with the preconditions enumerated in HRS § 516–33.[17] Indeed, Castle does not dispute the accuracy of the HFDC's determinations in these regards.

---

17. HRS § 516–33 (Supp.1992) provides in relevant part:

**Qualification for purchase.** Except as otherwise provided under [HRS §] 516–28, no sale of any residential houselot within a development tract shall be made to any person unless the person meets the following requirements:
(1) Is at least eighteen years of age;
(2) Is a bona fide resident of the State or has a bona fide intent to reside in the development tract if successful in purchasing the lot and does reside on the lot within five years of purchase of the lot, except in hardship circumstances as determined by the [HFDC];
(3) Has legal title to, or pursuant to an agreement of sale an equitable interest in, a residential structure situated on the leased lot applied for; provided that for the purposes of this section, the vendor under such agreement of sale shall not be eligible to purchase the lot ...;
(4) Has a letter of credit, certificate of deposit, proof of funds, or approved application from any lending institution demonstrating that the person will be able to promptly pay the [HFDC] for the leased fee interest in the lot;
(5) Submits an application in good faith in such form as is acceptable to the [HFDC];
(6) Executes a contract for purchase of the fee interest in such form as is acceptable to the [HFDC]; and
(7) Does not own in fee simple lands suitable for residential purposes for such person within the county and in or reasonably near the place of business of such person or has or have pending before the [HFDC] an unre-
fused application to lease or purchase a lot in a development tract. A person is deemed to own lands herein if the person, the person's spouse, or both the person and the person's spouse (unless separated and living apart under a decree of a court of competent jurisdiction) own lands.
....
In the event of a wilful breach of contract of a lessee to purchase the leased fee interest, the [HFDC] may sell or assign its interest without respect to the requirements of this section.
The [HFDC] may require additional testimony or evidence under oath in connection with any application. The determination by the [HFDC] of any applicant's eligibility shall be conclusive as to all persons thereafter dealing with the property; provided that the making of any false statement knowingly by applicants or other person in connection with any application shall constitute perjury and shall be punishable as such. The [HFDC] shall adopt rules pursuant to [HRS ch.] 91 to effectuate the purposes of this section.
HRS § 516–28 (1985 & Supp.1992) provides:
**Disposition, generally.** It shall be the policy of the [HFDC] to encourage the widespread fee simple ownership of residential lots situated within a development tract. Where necessary or desirable, the [HFDC] may lease the residential lots. Not more than one lot shall be sold in fee simple or leased to a purchaser or lessee. A husband and his wife together, unless separated and living apart under a decree of separation issued by a court of competent jurisdiction, shall be entitled to only one lot.
HRS § 516–33 was amended by 1993 Haw. Sess.L.Act 326, § 3 at 755–56. Most of the

Nor does Castle contest, and the records before us clearly establish as to each of the condemnation actions at issue in these appeals, that the HFDC determined that its global acquisitions would effectuate the public purposes of the HLRA, which, as noted above, we characterized in *Lyman* as "condemnation and resale of the fee interest in leasehold land [in order to] promote the objectives of increasing the availability of residential property, realigning the residential fee simple market, reducing land prices, and ... beneficially impact[ing] the state economy and general public welfare," *Lyman*, 68 Haw. at 71, 704 P.2d at 897, and which we held the legislature reasonably could have believed would be accomplished by the exercise of the state's condemnation powers. *Id.* at 70–71, 704 P.2d at 897.

These determinations of the number and qualifications of applying lessees and the "effectuation" of the public purposes of the HLRA—which are all that are required of the HFDC by HRS § 516–22—are a far cry from a reexamination of the question whether any given acquisition would *in fact* accomplish the legislature's articulated public purposes, a feat that the United States Supreme Court ruled that even the legislature was not required to accomplish in the first instance. *Midkiff*, 467 U.S. at 242, 104 S.Ct. at 2330. To construe HRS § 516–22 otherwise would be to doom the HFDC (as in the myth of Sisyphus, the tortured soul condemned in Tartarus—the infernal abyss below Hades to which the wicked were relegated for punishment after death—to roll a stone to the top of a slope, the stone always escaping him near the top and rolling down again) endlessly to relitigate *Midkiff* and *Lyman.*

Third, Castle's reliance on *Castle I* and *Takabuki, supra*, for the proposition that this court's case law mandates a case-by-case determination that any given condemnation pursuant to the HLRA would *in fact* further the act's public purposes is misplaced. Because, as we have noted *supra* at section III.A of this opinion, *Castle I* preceded the adjudication of the HLRA's constitutionality in *Midkiff* and *Lyman, Castle I* merely reflected this court's unwillingness to reach the question in the absence of a developed record permitting an assessment of "the sustainability of the findings of fact by the legislature *when it enacted and amended [the HLRA].*" *Castle I*, 65 Haw. at 465–67, 653 P.2d at 782–83 (emphasis added). Accordingly, *Castle I* is authority neither for the necessity of *subsequent* assessments of the sustainability of the legislature's findings nor for the propriety of case-by-case determinations, beyond those called for by HRS § 516–22 as enumerated above, that *particular* condemnations pursuant to the HLRA would *in fact* further the HLRA's public purposes. Indeed, if it were, *Castle I* would have been rendered obsolete by *Midkiff* and *Lyman. See supra* section III.B.3.

■ *Takabuki*, which, like the present appeals, involved an appeal from a designation by the HFDC of residential lots for leased fee condemnation, is also inapposite to Castle's position. In effect, this court held that HRS § 516–22 does not require a "contested case" hearing within the meaning of the Hawai'i Administrative Procedure Act (HAPA), HRS ch. 91 (1985 & Supp.1992).[18] *Takabuki*, 72 Haw. at 467, 822 P.2d at 956. We further held that landowners "have the right in ... eminent domain proceedings under HRS § 101–34 to contest ... public use" regarding

> whether or not the prerequisites to ... a condemnation set forth in the various pro-

amendments were "technical [and] nonsubstantive ... for the purposes of clarity, consistency, and style." Sen.Conf.Comm.Rep. No. 134, in 1993 Senate Journal, at 801; Hse. Conf.Comm.Rep. No. 134, in 1993 House Journal, at 937. HRS § 516–33(a)(2) was, however, amended substantively to provide:

> (2) Is a bona fide resident of the State and resides on the lot, except in hardship circumstances as determined by the [HFDC] on a case by case basis where such inability to reside on the lot arises out of a temporary job or military transfer, a temporary educational sabbatical[,] or the serious illness of

the person; provided further that if either the person or the lessor disagree with the [HFDC's] determination, they shall be entitled to a contested case proceeding under [HRS ch.] 91 in which both the person and lessor shall be parties.

HRS § 516–33(a)(2) (1993 Comp.).

18. In this regard, the enactment of HRS § 516–33(a)(2) (1993 Comp.) partially overruled *Takabuki* legislatively. *See supra* note 17. Other amendments to HAPA, effected in 1993 and 1994, did not affect the ongoing viability of *Takabuki*.

visions of [the HLRA,] such as the size of the tract, the number of persons applying, etc., have been met. Issues raised as to those qualifications are factual issues which the landowner is entitled to try, de novo, before the circuit court in an evidentiary hearing, despite any previous determination with respect thereto by the [HFDC].

*Id.* at 468, 822 P.2d at 956. Our construction of HRS § 101–34 in *Takabuki* is in complete harmony with that set forth in this opinion and in no way supports Castle's contention that it is entitled to a case-by-case adjudication that the HFDC's designations in the present matters have *in fact* furthered the public purposes of the HLRA.

Castle's last argument in support of its position that the HLRA no longer furthers any constitutional public purpose is based upon a "Study of the Resale of Leasehold Properties Converted to Fee Simple Ownership Under the Hawai'i Land Reform Act of 1967" (the Study), which Castle placed before the circuit court in the course the evidentiary hearings below. Specifically, Castle contends that the Study

shows that there is no longer any concentration of land ownership of residential houselots, that real estate prices in [Hawai'i] have been shaped by market forces and not by concentrated ownership of fee simple, and that in any event the effect of [the HLRA] is to reduce the supply of more moderately priced leasehold property from the market for residential houselots.

Without addressing the materiality of the Study as an evidentiary matter,[19] it is, in any event, conceptually irrelevant to our analysis of the HLRA's constitutionality. By its very nature, the Study is merely an attempt empirically to critique the continued validity of the legislatively articulated public purposes underlying the HLRA. As such, the Study is beside the point. First, as we have already demonstrated, it is irrelevant whether the legislature was empirically correct in the first place, so long as the legislature *rationally could have believed* that it was. *See generally* the discussion of *Midkiff* and *Lyman,*

*supra* at section III.B.3 of this opinion. Second, in light of the legislature's rational belief that the HLRA would promote its stated objectives, the courts are not proper forums for "empirical debates over the wisdom of takings." *Midkiff,* 467 U.S. at 242–43, 104 S.Ct. at 2330. *See also Kaneohe Bay Cruises, Inc.,* 75 Haw. at 260, 861 P.2d at 7; *see generally* section III.B.3 of this opinion. And third, the Study in no way undermines the HLRA's "primary purpose" of "provid[ing] means by which the lessees of residential leasehold lots may become vested with the fee simple title to their lots," Sen. Conf.Comm.Rep. No. 19 (Majority), in 1967 Senate Journal, at 800; Hse. Conf.Comm.Rep. No. 18, (Majority), in 1967 House Journal, at 859, by redistributing and proliferating fee simple ownership of residential land. *See generally* sections III.B.1 and 2 of this opinion.

Accordingly, and based on the foregoing analysis, we hold: (1) that Castle has failed to meet its burden of overcoming the presumptive constitutionality of the HLRA beyond a reasonable doubt; *Gaylord,* 78 Hawai'i at 137, 890 P.2d at 1177; *Kaneohe Bay Cruises, Inc.,* 75 Haw. at 260, 861 P.2d at 7; *Lyman,* 68 Haw. at 71–72, 704 P.2d at 898; and (2) deferring to the legislature's determination of public purpose, that the condemnation of Castle's leased fee interests in the residential houselots that are the subjects of these appeals satisfies the "public use" prerequisites of the fifth amendment to the United States Constitution and article I, section 20 of the Hawai'i Constitution.

C. *The Circuit Court Correctly Ruled That There Was No Genuine Issue Of Material Fact Regarding The Proper Designation Of, And Public Purpose Underlying, Acquisition Of The Kalaheo Houselots By The HFDC In Accordance With The HLRA And That, As A Matter Of Law, The HFDC Was Therefore Entitled To Summary Judgment With Respect Thereto.*

■ As a final matter, Castle contends in Appeal No. 16241 that there was a genuine

---

**19.** We note that the Study examined only *fee simple* residential properties that had previously been converted from leaseholds pursuant to the HLRA. As such, the Study begs the question of the relationship between the continued existence of residential *leaseholds* and the public purposes of the HLRA.

issue of material fact as to whether the condemnation of the Kalaheo lots would promote the public purposes of the HLRA and, therefore, that the circuit court erred in granting partial summary judgment in favor of the HFDC on the issue of public use.

In support of its contention, Castle relies on a report prepared in or about March 1992 by a certified general appraiser, entitled "A Preliminary Appraisal Report Valuing the Lessor Interest in One Hundred Seven Leasehold Sites" (the Report). Castle urges that, at the very least, the Report raises a genuine issue of material fact as to whether the Kalaheo lots are suitable for residential use; if they are not, Castle argues, then condemnation of the lots would not fall within the purview of the HLRA, which is directed solely at increasing the number of fee simple residential lots in Hawai'i. Although Castle correctly characterizes the public purpose underlying the HLRA, the Report does not generate a genuine issue of material fact.

The Report's objective was to determine the value of the leased fee interests in the Kalaheo lots for purposes of valuing "just compensation." It arrived at no conclusion regarding the suitability of the properties for residential use. At most, it speculated that

it is physically possible to build residential structures on the sites and to occupy them as homes, but this could be subject to the threat of injury or death to the occupant; not in the better interests of the community or in compliance with the City building standards concerning safe and habitable structures.

According to the Report, the Kalaheo Hillside lots are subject to slippage and/or movement of foundations because of soil problems and their location on a hillside. Moreover, the Report suggested that the Kalaheo Village lots are subject to flooding. Thus, the Report opined that "residential use is limited by the environmental hazards natural to the Kalaheos, by reason of physical limitations, negative economic feasibility[,] and by legal restrictions," such that "[h]ighest and best use for some [of the lots] may be passive park."

Nevertheless, the report acknowledged that: (1) the allegedly dangerous conditions of the land were commonly known to exist well before the period of time with which the Report was concerned; (2) the Kalaheo lots had been leased by Castle and used by lessees as residential property for the twenty-five years preceding the Report; and (3) the Kalaheo lots were zoned for residential use. Additionally, the record before us is devoid of any evidence that the applicant lessees would not continue to use the Kalaheo lots for residential purposes. Absent such evidence, it is simply irrelevant whether there may be some "better" use for the lots, or that some of the lots may have depressed value as residential sites, or that potential purchasers might not be able to purchase because of possible unwillingness of mortgagees to extend loans.

"Bare allegations or factually unsupported conclusions are insufficient to raise a genuine issue of material fact, and therefore, insufficient to reverse a grant of summary judgment." *Reed v. City and County of Honolulu,* 76 Hawai'i 219, 225, 873 P.2d 98, 104 (1994) (citations omitted). Thus, the Report's mere speculation and conclusory allegations regarding possible injury, death, uninhabitable structures, and preferable alternative uses of the lots are insufficient to raise genuine issues of material fact either as to the Kalaheo lots' suitability for residential use or as to whether their condemnation would further the public purposes of the HLRA.

We therefore hold that the circuit court did not err in granting partial summary judgment in favor of the HFDC and against Castle on the issue of public purpose.

## IV. *CONCLUSION*

Based on the foregoing, we hold that this court has jurisdiction under HRS § 101–34 to hear an appeal from an order granting partial summary judgment in a matter involving the exercise of the power of eminent domain. We also hold that the condemnation of the leased fee interests in residential houselots continues to satisfy the "public

use" prerequisite of the fifth amendment to the United States Constitution and article I, section 20 of the Hawai'i Constitution.

Accordingly, we affirm the circuit court's order in Appeal No. 16241 (Kalaheo Hillside/Kalaheo Village) granting partial summary judgment in favor of the HFDC and against Castle. We likewise affirm the judgments in the appeals consolidated in No. 16293. Specifically, we affirm the denial of Castle's motion to alter or amend the grant of partial summary judgment in Appeal No. 16314 (Maunawili) and the circuit court's findings of fact, conclusions of law, and judgments in Appeal Nos. 16293 (Olomana/Pohakupu/Kukanono) and 16315 (Pikoiloa). Finally, we affirm the findings of fact, conclusions of law, and judgment in Appeal No. 16625 (Keapuka II).